USDC SCAN INDEX SHEET











MICRO STAR

FORMGEN INC

LMM

3:96-CV-03435

*4*

*P/A.*

**ORIGINAL**

Michael L. Kirby (050895)
Steven B. Duke (137793)
**POST KIRBY NOONAN & SWEAT**
600 West Broadway, Suite 1100
San Diego, CA 92101-3302
Telephone No.: (619) 231-8666
Facsimile: (619) 231-9593

Michael S. Oberman (9838)
Jeffrey S. Trachtman (7956)
Gregory A. Horowitz (0797)
**KRAMER, LEVIN, NAFTALIS & FRANKEL**
919 Third Avenue
New York, New York 10022
Telephone No.: (212) 715-9100
Facsimile: (212) 715-8000

Attorneys for Defendants/Counterclaim-Plaintiffs
**FORMGEN, INC., GT INTERACTIVE SOFTWARE
CORP.** and **APOGEE SOFTWARE, LTD.**

FILED

AUG 9 1996

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICRO STAR, | Case No. 96-3435H (CM) |
| Plaintiff, | |
| vs. | **COUNTERCLAIM-PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| FORMGEN, INC. a corporation; GT INTERACTIVE SOFTWARE CORP., a corporation; 3D REALMS ENTERTAINMENT and DOES 1 THROUGH 100 INCLUSIVE, | |
| Defendants. | |
| FORMGEN, INC., GT INTERACTIVE SOFTWARE CORP., and APOGEE SOFTWARE, LTD. d/b/a 3D REALMS ENTERTAINMENT, | Date: September 9, 1996<br>Time: 10:30 a.m.<br>Ctrm: Honorable Marilyn L. Huff |
| Counterclaim-Plaintiffs, | |
| - against - | |
| MICRO STAR, | |
| Counterclaim-Defendant. | |

PKNS\0098634.WP



## TABLE OF CONTENTS

Page

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

    The Original Game . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

    The Infringing Product . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

I.    STANDARDS GOVERNING GRANTING OF A PRELIMINARY
    INJUNCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

II.    MOVANTS HAVE DEMONSTRATED AN OVERWHELMING
    LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR COPYRIGHT
    AND LANHAM ACT CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

    A.    Movants Have Established a Likelihood of Proving That Micro Star Has
        Violated Their Copyright in the Duke Nukem Game . . . . . . . . . . . . . .   7

        1.    Movants have a valid copyright in the Duke Nukem
            3D game and its elements that extends to derivative
            works created by others . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

        2.    Micro Star has copied protected elements of the
            DN3D game . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

        3.    Micro Star's claim that the material included in
            Nuke It is in the public domain is frivolous . . . . . . . . . . . . . .   10

    B.    Movants Are Likely to Prevail on Their Lanham Act Claims . . . . . . . . .   13

        1.    Nuke It Creates a False Association With the
            Creators of Duke Nukem 3D . . . . . . . . . . . . . . . . . . . . . . . .   13

        2.    Nuke It Improperly Appropriates Movants'
            Protected Trade Dress . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

        3.    Nuke It's Packaging Also Violates the Lanham
            Act's Prohibition of False Advertising . . . . . . . . . . . . . . . . . .   17

III.    THE OTHER RELEVANT FACTORS FAVOR THE GRANTING OF A
    PRELIMINARY INJUNCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

PKNS\0098634.WP

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adray v. Adry-Mart, Inc.*,
    76 F.3d 984 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Allen v. National Video, Inc.*,
    610 F. Supp. 612 (S.D.N.Y. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*American GeoPhysical Union v. Texaco*,
    60 F.3d 913 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Apple Computer Inc. v. Franklin Computer Corp.*,
    714 F.2d 1240 (3d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Arizona Retail System, Inc. v. Software Link, Inc.*,
    831 F. Supp. 759 (D. Ariz. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Atari, Inc. v. North America Philips Consumer Electrics Corp.*,
    672 F.2d 607 (7th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Better Business Bureau v. Medical Directors, Inc.*,
    681 F.2d 397 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-14

*Boston Professional Hockey Association v. Dallas Cap & Emblem Mfg.*,
    510 F.2d 1004 (5th Cir.),
    *cert. denied*, 423 U.S. 868 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Broderbund Software, Inc. v. Unison World, Inc.*,
    648 F. Supp. 1127 (N.D. Cal. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Columbia Pictures Industrial, Inc. v. Redd Horne, Inc.*,
    749 F.2d 154 (3d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Cook, Perkiss and Liehe, Inc. v. Northern California Collection Service, Inc.*,
    911 F.2d 242 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Engineering Dynamics, Inc. v. Structural Software, Inc.*,
    26 F.3d 1335 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*FASA Corp. v. Playmates Toys, Inc.*,
    912 F. Supp. 1124 (M.D. Ill. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Feist Publications, Inc. v. Rural Telephone Service Co.*,
    499 U.S. 340 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Filmvideo Releasing Corp. v. Hastings*,
    668 F.2d 91 (2d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

PKNS\0098634.WP

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Gilliam v. American Broadcasting Cos., Inc.,*
538 F.2d 14 (2d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.,*
832 F.2d 1311 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Johnson Controls, Inc. v. Phoenix Control System, Inc.,*
886 F.2d 1173 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

*Kepner-Tregoe, Inc. v. Leadership Software, Inc.,*
12 F.3d 527 (5th Cir.),
*cert. denied*, 115 S. Ct. 82 (1994) . . . . . . . . . . . . . . . . . . . . . . 9

*King v. Innovation Books,*
976 F.2d 824 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*La Cienega Music Co. v. ZZ Top,*
53 F.3d 950 (9th Cir.),
*cert. denied*, 116 S. Ct. 331 (1995) . . . . . . . . . . . . . . . . . . . . . . 12

*M. Kramer Manufacturing Co. v. Andrews,*
783 F.2d 421 (4th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Metro Publishing, Ltd. v. San Jose Mercury News,*
987 F.2d 637 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Microsoft Corp. v. Grey Computer,*
910 F. Supp. 1077 (D. Md. 1995) . . . . . . . . . . . . . . . . . . . . . . . . 12

*Omega Importing Corp. v. Petri-Kine Camera Co.,*
451 F.2d 1190 (2d Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Playboy Enterprises, Inc. v. Baccarat Clothing Co.,*
692 F.2d 1272 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Polo Fashions, Inc. v. Craftex, Inc.,*
816 F.2d 145 (4th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*ProCD, Inc. v. Zeidenberg,*
86 F.3d 1447 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Russell v. Price,*
448 F. Supp. 303 (C.D. Cal. 1977), *aff'd,*
612 F.2d 1123 (9th Cir. 1979), *cert. denied,*
446 U.S. 952 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Sega Enterprises, Ltd. v. Maphia,*
857 F. Supp. 679 (N.D. Cal. 1994) . . . . . . . . . . . . . . . . . . . . 8, 14, 18

*Smith v. Jackson,*
84 F.3d 1213 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

PKNS\0098634.WP

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Stern Electrics Inc. v. Kaufman,*
669 F.2d 852 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Triad System Corp. v. Southeastern Express Co.,*
64 F.3d 1330 (9th Cir. 1995), *cert. denied,*
116 S. Ct. 1015 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Two Pesos, Inc. v. Taco Cabana, Inc.,*
505 U.S. 763 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States Jaycees v. Philadelphia Jaycees,*
639 F.2d 134 (3d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Vault Corp. v. Quaid Software, Ltd.,*
847 F.2d 255 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Vision Sports, Inc. v. Melville Corp.,*
888 F.2d 609 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . 7, 15, 16

*Waits v. Frito-Lay, Inc.,*
978 F.2d 1093 (9th Cir. 1992), *cert. denied,*
506 U.S. 1080 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Walt Disney Productions v. Air Pirates,*
581 F.2d 751 (9th Cir. 1978)
*cert. denied,* 493 U.S. 1132 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

### Statutes

15 United States Code
Section 1125(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

17 United States Code
Section 103(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
Section 106(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11
Section 410(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

### Other Authorities

J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition
§ 8.01[2], at 8-7 (3d. ed. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 3.05, at 3-34.2 -
34.3 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Edward Samuels, The Public Domain in Copyright Law, Journal of the
Copyright Society of the U.S.A. 137, 159 (Winter 1993) . . . . . . . . . . . . . . . . . 12

PKNS\0098634.WP

iv

Counterclaim-plaintiffs FormGen, Inc. ("FormGen") and Apogee Software, Ltd., d/b/a 3D Realms Entertainment ("Apogee") (together "Movants") submit this Memorandum of Points and Authorities in support of their motion for a preliminary injunction against counterclaim-defendant Micro Star.

## Preliminary Statement

Movants seek a preliminary injunction to stop a blatant infringement of their intellectual property rights. Apogee and FormGen are the creator and publisher, respectively, of Duke Nukem 3D ("DN3D"), an extraordinarily successful interactive computer game that has sold more than 500,000 units nationwide. DN3D consists of unique characters, design elements, and other expressive content protected by the federal Copyright Act. Micro Star has flouted those protections by packaging and selling without Movants' permission derivative works containing Movants' protected expression. When Micro Star was called on its unlawful conduct, it launched this preemptive action. Micro Star got to the courthouse first, but Movants are the true plaintiffs here.

The derivative works copied by Micro Star are a series of new "levels" for the DN3D game -- in essence, new scenarios comprised of existing graphic elements and characters -- that Movants permitted purchasers of DN3D to create for private, non-commercial use. Movants authorized such users to share these new "levels" on the Internet and through similar media but expressly provided that no fee could be charged and that the right to collect any royalties from the new levels would revert to Movants. Movants expressly reserved all of their rights to the underlying material.[1]

Observing this activity and the success of DN3D, Micro Star came up with an easy way to make money at Movants' expense: It simply downloaded a group of these new levels from the Internet, packaged them as "Nuke It," a product promising "OVER 300 NEW LEVELS FOR DUKE NUKEM 3D," and placed it in software stores to be sold next to the

---

[1] For simplicity, this memorandum refers collectively to Movants' rights. More particularly, Apogee has rights of ownership in DN3D's copyrights, trademarks, and trade dress; FormGen has an exclusive, four-year worldwide license to publish and distribute DN3D.

original DN3D product, where -- notwithstanding a purported disclaimer in tiny type -- buyers would obviously assume that Movants had issued a companion product for their original game.

Nuke It is a plain violation of Movants' copyright. It is comprised entirely of levels made up principally, if not exclusively, of copyright-protected audio-visual elements, computer code, and English text files taken directly from the original DN3D game. Micro Star never sought or obtained permission from Movants to use this material for commercial purposes -- it simply took it. In addition to infringing Movants' rights in the underlying material, Micro Star is interfering with Movants' plans to issue their own, professional quality package of new levels.

The core principle of copyright law -- the right to set limits on the uses of one's protected expression -- requires that Nuke It be enjoined. If this kind of free-rider product is allowed, no computer game producer concerned about its copyright would again permit users even the limited right to design their own levels -- and game consumers would be the losers.

Nuke It also violates the Lanham Act's bans on false designations as to source of origin and false advertising. Nuke It embodies the unique look and sound of the DN3D game. It has a confusingly similar title, is marketed in the same channels, and makes many express references to DN3D on its package. Nuke It thereby creates a false association with the creators of DN3D, improperly freeloading on Movants' goodwill, as well as infringing upon their protected trade dress. Nuke It's statement that it combines "OVER 300 NEW LEVELS" for DN3D is also literally false, since all of the material included is available on the Internet for free and none of it was created by Micro Star.

Movants have tried in vain to obtain Micro Star's voluntary compliance with its legal obligations. Instead, Micro Star brought this action, in which it remarkably seeks to defend its infringement as merely providing a "convenient" repackaging of material in the "public domain." Amended Complaint ¶ 1. But as Micro Star must know and we demonstrate below, protected expression lifted from DN3D is *not* in the public domain -- the argument is a frivolous cover for simple misappropriation. Movants are entitled to a preliminary injunction against further sales of the infringing Nuke It product pending trial.

## Factual Background

The facts entitling Movants to an injunction, described in more detail in the Declarations of Scott Miller and Allen H. Blum III, are largely undisputed -- and indeed mostly admitted by Micro Star in its Amended Complaint. Duke Nukem 3D is the best selling entertainment software product in the market today. Since its release in May 1996, the registered version has sold over 500,000 units in CD-ROM (compact disk) format in the U.S. alone. The Duke Nukem character ("Duke"), introduced in his current form in a shareware version of the game in January 1996, has become so well known that a computer magazine recently ran an "interview" with him. Miller Decl. Exh. 6. DN3D represents an extremely valuable franchise for Apogee, which created it, and FormGen, which published and markets it under an exclusive license.

### The Original Game

The DN3D game is set in a futuristic Los Angeles overtaken by sinister space aliens. The game permits a player to explore this environment, as well as an alien space station, through the eyes of the heavily armed Duke Nukem, who confronts and destroys various types of aliens who appear amidst towering skyscrapers, deep canyons, and eerie abandoned buildings. The game contains very sophisticated graphics and sound effects and is distinguished by a realistic "3-D" look in which a player has full mobility within a detailed and life-like environment. *See* Blum Decl. ¶¶ 3-4. DN3D has received rave reviews from computer publications for its realistic graphics, sound effects, and overall creativity. It has led several published lists of top game programs since its release. *See* Miller Decl. ¶¶ 11-13.

A host of unique expressive features are covered by DN3D's copyright protection, starting with Duke himself and a number of other visually distinct characters, including Assault Trooper, Assault Captain, Octabrain, Protozoid Slimer, Sentry Drone, Enforcer, and others. Each of these characters has a distinct physical appearance and history. *See* Blum Decl. ¶¶ 6-7 & Exh. 2.

DN3D also contains unique, repetitive elements in the design of buildings and other physical structures, decorative details including posters and billboards, and various props

including medkits, armor, jet pack, and scuba gear used by the Duke character. The game play is accompanied by action movie-style dialogue, heart-pounding music, and dramatic sound effects. The totality of these elements is a unique and distinctive product with its own "look" -- one that has proved incredibly popular with the predominately young male audience for action-oriented computer games. Blum Decl. ¶¶ 3-5.

Beyond the audio-visual features of the game itself, other aspects of DN3D are covered by its copyright: DN3D English language text files containing instructions and other information, "control files" allowing modification of screen displays, and the underlying computer "code" -- the technical data from which the computer program generates images on the screen, which is organized in data files that are unique and proprietary to Movants.

DN3D comes with 29 "levels" -- each a separate simulated environment through which Duke must navigate, destroying aliens before they destroy him. Players who become expert at the game can progress through all of the levels. The game includes a "Build Editor" that enables players to create new levels by, in effect, cutting and pasting various audio-visual elements from existing levels to create new environments with different combinations of architecture, decoration, and threatening aliens. These new levels, comprised largely if not totally of elements of protected expression, are substantially similar to the levels contained in the underlying game and therefore are derivative works under the Copyright Act. In addition to embodying the same audio-visual elements, they include substantial portions of identical underlying computer code, also protected by the Act. Blum Decl. ¶¶ 10-11.

A limited, non-exclusive license comes with the software package (the "User License") and is referenced on the screen every time a player accesses the Build Editor. The License authorizes DN3D users to create new levels only if they meet a series of specific criteria designed to permit amateur use while protecting Movants' commercial rights and reputation. *See* Miller Decl. ¶ 8 & Exh. 1. In relevant part, the User License requires new levels to be identified with their creators and to indicate that "THIS LEVEL IS NOT MADE BY OR SUPPORTED BY 3D REALMS"; requires that "*the level and any use of it must be offered solely for free* (other than any incidental on-line charges)" (emphasis added); provides that by

distributing or permitting the distribution of any new level, its creators "grant back to 3D Realms an irrevocable royalty free right to distribute the level"; and expressly reserves all other rights for Movants. *See* Miller Decl. ¶ 8 & Exh. 1.[2]

Movants imposed these restrictions to prevent the commercial distribution of levels over which they cannot assert quality control and to retain solely for themselves the commercial value of exploiting DN3D's popularity through the marketing of new collections of levels, or "level packs." *See* Miller Decl. ¶ 9. Indeed, Movants are actively working on the creation of new levels for DN3D, involving original design elements that will maintain the high quality associated with the original game. These new levels will be marketed as a separate product to which Apogee will own the copyright and FormGen exclusive rights to publish and market. *See* Miller Decl. ¶ 14.

**The Infringing Product**

Movants have recently become aware of the marketing of "Nuke It," a software product in CD-ROM format that compiles and sells a large number of levels created by DN3D users and placed on the Internet and like media. Because these levels are little more than pastiches of elements lifted from the original game -- existing images of buildings, characters, and props rearranged into new settings for Duke's adventures -- they contain substantial copying of Movants' protected expression. They also reflect the distinctive "look" of the original DN3D game. Indeed, several are only slightly edited versions of original DN3D levels. Blum Decl. ¶ 17. These new levels were simply downloaded from the Internet and do not reflect any creative contribution by Micro Star, which Micro Star admits. *See* Amended Complaint ¶ 21.

In addition to appropriating protected audio-visual components of the DN3D game, Nuke It includes control files containing both substantial portions of English language text lifted verbatim from the original game and substantial portions of computer code unique and

---

[2] In view of this detailed license included with the registered version of the game, Micro Star's allegation that DN3D "does not contain any licensing agreement to which a purchaser ostensibly agrees to be bound, such as a so-called shrink wrap license" (Amended Complaint ¶ 20) is false and inexplicable.

proprietary to Movants. Blum Decl. ¶ 16. Finally, the Nuke It CD contains a series of still pictures of saved screen images -- known as "bitmaps" -- lifted from new levels but comprised entirely of original DN3D elements. Blum Decl. ¶ 20.

Micro Star's packaging and marketing of Nuke It reflects an obvious attempt to trade on the value of the DN3D franchise. The "Nuke It" logo is presented in a typeface virtually identical to the "Duke Nukem 3D" logo on the package in which the DN3D game is sold. Nuke It promises "OVER 300 NEW LEVELS FOR DUKE NUKEM 3D" and declares that it "includes cheat codes and hints for Duke Nukem 3D" and that "FREE INSIDE" are "25 Duke Nukem scenes for use as Wallpaper in Windows or Windows 95." The packaging also itself displays a number of still photographs of screen images comprised entirely of specific elements recognizable from the DN3D game -- including types of aliens, weapons, scenery, and (with perhaps greater emphasis than in the original DN3D game) images of scantily clad women. *See* Miller Decl. ¶ 17 & Exh. 11. The packaging nowhere discloses that Nuke It's "new levels" are not new at all -- they were all created by amateurs cutting and pasting on their home computers and are available for free on the Internet.

The Nuke It package contains a purported disclaimer in tiny print that, in the context of the total presentation, does nothing to dispel the overwhelming impression that Nuke It is produced by the same people who created DN3D -- that it is a Duke Nukem product. *See* Miller Decl. ¶ 17. *Compare* Miller Decl. Exh. 11 & Blum Decl. 1 Exh. 1. Nuke It is being sold next to DN3D in major software stores across the country, strengthening the wrongful association between the products.[3]

The continued marketing of Nuke It will cause substantial irreparable harm to Movants. Every sale of a Nuke It level pack preempts a potential sale for Movants' upcoming authorized level pack product. In addition, because many of the levels included in Nuke It are of an amateur quality, continued sales of Nuke It will generate negative word of mouth that will hurt

---

[3] Micro Star claims to have added a "bright red sticker" to the Nuke It box declaring that the "new" levels were created by third parties. Amended Complaint ¶ 22. Despite requests that it do so, Micro Star has failed to provide Movants with a copy of the alleged new packaging. Nuke It is still being sold without the added label. Hecht Decl. ¶¶ 2-4.

Movants' reputation and harm the value of the Duke Nukem franchise, interfering with Movants' ability to launch successful sequels and ancillary protected products. *See* Miller Decl. ¶¶ 18-19.

<u>Argument</u>

### I.   STANDARDS GOVERNING GRANTING OF A PRELIMINARY INJUNCTION

On a claim for copyright or trademark infringement, preliminary injunctive relief is warranted upon a demonstration of *either* (1) a combination of probable success on the merits and the possibility of irreparable injury *or* (2) serious questions going to the merits and a balance of hardships tipping sharply in movant's favor. *See Triad Sys. Corp. v. Southeastern Express Co.*, 64 F.3d 1330, 1334 (9th Cir. 1995), *cert. denied*, 116 S. Ct. 1015 (1996).

Likelihood of success on the merits is by far the most important factor in intellectual property cases. "[I]n a copyright infringement claim, a showing of a reasonable likelihood of success on the merits raises a presumption of irreparable harm." *Johnson Controls, Inc. v. Phoenix Control Sys., Inc.*, 886 F.2d 1173, 1174 (9th Cir. 1989). Similarly, "[i]n trademark infringement or unfair competition actions, once the plaintiff establishes a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted." *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 612 n.3 (9th Cir. 1989).

### II.   MOVANTS HAVE DEMONSTRATED AN OVERWHELMING LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR COPYRIGHT AND LANHAM ACT CLAIMS

Movants have powerful claims for copyright infringement and Lanham Act violations based on Micro Star's appropriation of protected aspects of the DN3D game.

#### A.   Movants Have Established a Likelihood of Proving That Micro Star Has Violated Their Copyright in the Duke Nukem Game

The facts outlined above and in the accompanying declarations describe an obvious violation of Movants' copyright in the DN3D computer game, particularly with respect to their exclusive rights over reproduction and distribution. Micro Star has simply taken copyrighted

material, repackaged it, and sold it as its own, offering only frivolous justifications for its infringing conduct.

To establish copyright infringement, a plaintiff must prove (1) ownership of a valid copyright and (2) that defendant copied a substantial portion of protected elements from the copyrighted work. *See, e.g., Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361 (1991); *Smith v. Jackson,* 84 F.3d 1213, 1218 (9th Cir. 1996). Both of these elements are easily established on the present record.

### 1. Movants have a valid copyright in the Duke Nukem 3D game and its elements that extends to derivative works created by others

The art work, characters, English language text files, and programming code comprising the DN3D game are all subject to copyright protection. Apogee has made an expedited application for copyright registration, and the certificate, when issued, will serve as *prima facie* evidence of the validity of the copyright under 17 U.S.C. § 410(c). In any event, Apogee's authorship of DN3D has never been questioned and is expressly admitted by Micro Star. Amended Complaint ¶ 3.

It has long been established that audio-visual elements of computer games and other computer programs are copyrightable under the 1976 Copyright Act. *See, e.g., M. Kramer Mfg. Co. v. Andrews,* 783 F.2d 421, 435 (4th Cir. 1986); *Atari, Inc. v. North Am. Philips Consumer Elecs. Corp.,* 672 F.2d 607, 617 (7th Cir. 1982); *Stern Elecs. Inc. v. Kaufman,* 669 F.2d 852, 856 (2d Cir. 1982); *Sega Enters., Ltd. v. Maphia,* 857 F. Supp. 679, 686 (N.D. Cal. 1994); *Broderbund Software, Inc. v. Unison World, Inc.,* 648 F. Supp. 1127, 1132-33 (N.D. Cal. 1986).

Particular fanciful characters -- such as Duke himself and his various alien enemies -- are independently copyrightable, as are fanciful props such as Duke's medkits, armor, and other gear. *See, e.g., Atari,* 672 F.2d at 617-18; *Walt Disney Prods. v. Air Pirates,* 581 F.2d 751, 754 (9th Cir. 1978), *cert. denied,* 493 U.S. 1132 (1979). Even if any of these elements were deemed to be stock devices under the "scenes a faire" doctrine, they would be protected from literal copying. *See Atari,* 672 F.2d at 617.

PKNS\0098634.WP

8

In addition, both English language instructions, *see Engineering Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1347 (5th Cir. 1991), and computer code, *see Johnson Controls*, 886 F.2d at 1175, are subject to copyright protection. The Ninth Circuit has recognized that both the "literal" aspects of computer code (the specific, verbatim commands embodying protected original expression) and the non-literal aspects (*e.g.*, distinctive structure, sequence, and organization of works) may be protected. *Id.*

Section 106(2) of the Copyright Act grants to authors the exclusive right to prepare derivative works based on the copyrighted work. Where the author grants a limited license to another party to prepare a derivative work (*e.g.*, a film version of a novel), the original author's rights in the underlying material are unaffected. *See* 17 U.S.C. § 103(b). Where the licensee's use of the material exceeds the scope of the license, or a third party appropriates material from the derivative work protected by the underlying copyright, the original copyright owner may sue for infringement. *See Gilliam v. American Broadcasting Cos., Inc.*, 538 F.2d 14, 20 (2d Cir. 1976). Moreover, rights under the Act are severable; waiver of one does not affect any other. *See Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*, 749 F.2d 154, 158 (3d Cir. 1984).

Thus, Movants are entitled to enforce their copyright in the underlying game whether elements were copied directly from the product or lifted from derivative works containing such elements. Lifting protected expression from third party sources and reproducing it for commercial purposes without permission infringes the underlying copyright: "Copying a copy of copyrighted materials is a cognizable countervention of the copyright code." *Kepner-Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 533 (5th Cir.), *cert. denied*, 115 S. Ct. 82 (1994). *See also* MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 3.05, at 3-34.2 - 34.3 (1996) ("[I]f the material copied was derived from a copyrighted underlying work, this will constitute an infringement of such work regardless of whether the defendant copied directly from the underlying work, or indirectly via the derivative work."). This is precisely what Micro Star has done here.

### 2. Micro Star has copied protected elements of the DN3D game

The second element of a basic copyright claim is also easily satisfied here. Unlike situations in which mere similarity plus access are the basis for an inference of copying, this is a case of admitted literal copying. The offending product is simply a compilation of derivative works -- new levels and screen shots made up of protected material from the underlying original game. The character of Duke himself; the various alien combatants he confronts; the buildings, scenery, and props comprising the remaining visual elements; and the dialogue, sound effects, and music that accompany the images are all literally copied from the underlying game. *See* Amended Complaint ¶ 21. As demonstrated above, that they were first copied (with Movants' rights expressly reserved) by the intermediate authors of derivative works and rearranged (sometimes minimally) is legally irrelevant. Thus, both Movants' rights in the underlying material and the literal copying constituting infringement of that material are admitted, showing more than a mere likelihood of success on the merits of Movants' copyright infringement action and justifying an immediate preliminary injunction.

### 3. Micro Star's claim that the material included in Nuke It is in the public domain is frivolous

Micro Star's Amended Complaint sets forth a single purported justification for its unauthorized copying: that the material included in Nuke It is supposedly in the "public domain." This argument is apparently based on the permission granted to users of DN3D to create new game levels and circulate them *non-commercially*. Notwithstanding its misleading allegation that DN3D "does not contain any licensing agreement" (Amended Complaint ¶ 20), Micro Star implicitly acknowledges the existence of the User License in pleading that "there are no *enforceable* limits placed on the use and dissemination of the third party MAP files" (*id.*) (emphasis added). Micro Star's argument thus appears to be that the User License is unenforceable and as a consequence the newly created levels and all of the protected expression contained in them somehow passed into the public domain.

The argument is based on a series of confusions and non sequiturs. Movants are not suing to enforce any rights created by the User License (*e.g.*, rights to the derivative work

itself), but to enforce their rights in the underlying material, which are unaffected by the License. As noted by the Seventh Circuit in a recent decision, contract rights and copyright protection are two different things: "Someone who found a copy of [a software product] on the street would not be affected by the shrinkwrap license -- though the federal copyright laws of their own force would limit the finder's ability to copy or transmit the application program." *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1454 (7th Cir. 1996).

Further, even assuming that new expression contained in the new levels created by DN3D users were in the public domain, Movants' rights to the underlying work would remain enforceable: "[E]ven though the derivative work may have fallen into the public domain, to the extent that it partakes of the original work it cannot be used without the consent of the proprietor of the underlying copyright." *Russell v. Price*, 448 F. Supp. 303, 305 (C.D. Cal. 1977), *aff'd*, 612 F.2d 1123 (9th Cir. 1979), *cert. denied*, 446 U.S. 952 (1980). "Since the proprietor of a derivative copyright cannot convey away that which he does not own, it follows that he can't release that which he does not own into the public domain." *Filmvideo Releasing Corp. v. Hastings*, 668 F.2d 91, 93 (2d Cir. 1981) (citation omitted).

Moreover, if the License is not enforceable, then Movants and buyers of the game revert to their statutory rights -- with Movants retaining the exclusive right to create derivative works based on DN3D. *See* 17 U.S.C. § 106(2). In this scenario, the new levels would not be in the public domain -- they would be unauthorized works themselves infringing upon the underlying copyright, an infringement that could not be remedied by Micro Star's repackaging of the offending material.

Micro Star's argument depends upon an absurd proposition -- that the users of DN3D received all the benefits of the User License (the right to create and distribute new levels) with none of the burdens (*e.g.,* no commercial sales, granting rights back to Movants). Micro Star apparently contends that users of DN3D obtained, without an enforceable license, not only this valuable right to create new derivative works but also the ability to "waive" Movants' copyright in the underlying original material and to pass the elements from which the new

levels were assembled into the public domain. Movants are aware of no authority supporting this bizarre and illogical construct.[4]

Micro Star's "public domain" defense is further misplaced because it overlooks evolution in copyright law that makes it extremely difficult for new works to lose copyright protection. Historically, works within the statutory term of copyright fell into the public domain for failure to comply with the statutory formalities for federal copyright protection, most particularly the notice requirement. *See, e.g., La Cienega Music Co. v. ZZ Top*, 53 F.3d 950 (9th Cir.), *cert. denied*, 116 S. Ct. 331 (1995) (songs released on phonorecords fell into public domain for lack of compliance with requirements of Copyright Act of 1909). But, over time, Congress has eliminated all of the statutory requirements (including the notice requirement) that -- if not observed -- previously resulted in a forfeiture of the copyright in a work; indeed, it is now an issue for academic debate how an author might intentionally dedicate a work to the public domain, if he or she so intended. *See generally* Edward Samuels, *The Public Domain in Copyright Law*, JOURNAL OF THE COPYRIGHT SOCIETY OF THE U.S.A. 137, 159 (Winter 1993).

In this case, the Court need not reach for the metaphysical, since Movants have made unambiguously clear their intent to protect and enforce their rights in DN3D. While legally unnecessary, DN3D bears a prominent copyright notice -- alerting any would be user, such as Micro Star, from whom to seek consent for any use of the work. And the User License narrowly restricts the scope of the grant to purchasers of the game to make derivative works; Movants preserve for themselves the sole right to exploit their protected expression

---

[4] In any event, the User License *is* enforceable. As owner of the copyright, Apogee "has the exclusive right to limit the distribution chain of its products." *Microsoft Corp. v. Grey Computer*, 910 F. Supp. 1077, 1084 (D. Md. 1995). "Shrinkwrap licenses" similar to the User License have been recognized as enforceable. *See ProCD*, 86 F.3d at 1453-54 (upholding shrinkwrap license limiting buyer to non-commercial use of software). As in *ProCD*, the license here does not purport to take away rights understood to be part of the basic contract created by the sale of the software; it merely sets appropriate limits on activities that would not ordinarily be part of the bundle of rights purchased with a CD-ROM product. In essence, Apogee makes users an offer: If you would like the right to distribute additional levels, you must agree to these terms and form a new contract.

In contrast, courts have refused to enforce shrinkwrap agreements that purport unilaterally to override the parties' prior contract, *see Arizona Retail Sys., Inc. v. Software Link, Inc.*, 831 F. Supp. 759 (D. Ariz. 1993), or limit, in ways inconsistent with the Copyright Act, the buyer's basic right to use the program, *see Vault Corp. v. Quaid Software, Ltd.*, 847 F.2d 255, 269 (5th Cir. 1988).

commercially.  In these circumstances, it cannot be said that Movants had any intention of putting their protected expression into the public domain.

Without its "public domain" argument, Micro Star has no conceivable justification for its wholesale copying and sale of Movants' protected expression.  Indeed, Nuke It is the type of work most likely to be found infringing:  a commercial use interfering with the potential markets for the copyright owner that adds nothing of value to the protected expression.  *See American GeoPhysical Union v. Texaco*, 60 F.3d 913, 922 (2d Cir. 1995).  Thus, the likelihood of success -- and the need for an injunction halting distribution of Nuke It -- is clear.

**B.     Movants Are Likely to Prevail on Their Lanham Act Claims**

Micro Star's Nuke It product is designed to trade on the goodwill associated with the Duke Nukem franchise by presenting itself as a related product.  Even a cursory examination of the two products, their packaging, and their marketing demonstrate that consumers will be confused as to Nuke It's source of origin, and Movants are therefore likely to prevail in a claim under § 43(a) of the Lanham Act, which prohibits false and misleading representations creating such confusion.  *See* 15 U.S.C. § 1125(a)(1).  Movants have strong claims under case law dealing with false association or endorsement as well as related cases involving trade dress infringement.  Movants also have a claim under the other branch of § 43(a), which prohibits false statements regarding "the nature, characteristics, quality, or geographic origin" of a product.  *Id.*  Micro Star's statement on the Nuke It package that the product includes "OVER 300 NEW LEVELS" for DN3D is literally false; every level included in the pack was previously available for free noncommercial use over the Internet and thus is not "new."

**1.     Nuke It Creates a False Association With the
Creators of Duke Nukem 3D**

The Lanham Act provides a cause of action for creation of a false impression of an association or an endorsement regarding a product or service, whether based on use of a mark, trade dress infringement, or other misleading representations.  *See, e.g.*, *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093 (9th Cir. 1992), *cert. denied*, 506 U.S. 1080 (1993); *Better Business*

*Bureau v. Medical Directors, Inc.*, 681 F.2d 397, 402-03 (5th Cir. 1982); *Sega Enters. Ltd. v. Maphia*, 857 F. Supp. 679 (N.D. Cal. 1994); *Allen v. National Video, Inc.*, 610 F. Supp. 612 (S.D.N.Y. 1985).

The overall presentation of Nuke It creates the false impression that it comes from the makers of DN3D. Nuke It's box proclaims in bold letters that it offers "OVER 300 NEW LEVELS FOR DUKE NUKEM"; trumpets that "FREE INSIDE" are "25 Duke Nukem scenes" for use as screen savers; and promises that the product "includes cheat codes and hints for Duke Nukem 3D" -- undeniably presenting itself as a Duke Nukem product. On these signals alone, many reasonable consumers are likely to be confused as to the source of origin of Nuke It. Indeed, the most reasonable inference flowing from a browser's examination of the package is that Nuke It was produced by the makers of DN3D. Creation of this false impression poaches on the goodwill created by Movants' skill and artistry and violates the Lanham Act.

Micro Star's only lip service to avoiding confusion is to include a purported disclaimer in tiny type on its software box. Disclaimers, particularly those in small print, are widely recognized as ineffective to avoid a likelihood of confusion. *See, e.g., Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*, 832 F.2d 1311, 1316 (2d Cir. 1987); *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 142 (3d Cir. 1981); *Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg.*, 510 F.2d 1004, 1013 (5th Cir.), *cert. denied*, 423 U.S. 868 (1975); *Allen*, 610 F. Supp. at 629. The Ninth Circuit has acknowledged studies suggesting that "disclaimers have little or no effect in preventing consumer confusion," and therefore has approved their use only in cases involving "a defendant who had a substantial interest in continued use of the mark, because of past investment that had built up goodwill or because of the defendant's interest in using its own name." *Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 990-91 (9th Cir. 1996).

Here, Micro Star has no legitimate interest in piggybacking on Movants' success, and the Nuke It disclaimer is in any event particularly ineffective. The most prominent line in the disclaimer reads "REQUIRES REGISTERED VERSION OF DUKE NUKEM 3D™" -- which

reinforces rather than negates the association with the original Duke product. The disclaimer then recites in far smaller type that "Duke Nukem 3D is a registered trademark of 3D Realms Entertainment. This product is not affiliated with nor will it be supported by 3D Realms Entertainment." (As noted above, we have not been provided with a copy of Nuke It's purported "new" sticker and thus cannot comment on whether it reduces the substantial confusion caused by the original packaging.)

The Court should examine this fine print disclaimer in the context of the overall presentation of the Nuke It product. Movants submit that it is ineffective as a matter of law. At the very least, Movants have demonstrated a likelihood that consumers will be confused or misled about the source of origin of the Nuke It product.

### 2. Nuke It Improperly Appropriates Movants' Protected Trade Dress

Nuke It also violates the Lanham Act by appropriating easily recognizable components of DN3D's distinctive trade dress. Trade dress refers to the image and overall appearance of a product. *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 613 (9th Cir. 1989). It encompasses not just the appearance of labels, wrappers, and containers used in the packaging of a product, but also the total look of the product, including the design or shape of the product itself. J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 8.01[2], at 8-7 (3d. ed. 1992).

Trade dress has been held to include such things as the appearance of a teddy bear toy, a Rubik's cube puzzle, the appearance of a video game console, and even the distinctive performing style of a rock music group. *Id.* at § 8.01[2], at 8-8 to 8-9 (citing cases). Protectable trade dress rights have been found in specific characters and images embodied in a computer game. *See FASA Corp. v. Playmates Toys, Inc.* 912 F. Supp. 1124, 1150 (M.D. Ill. 1996).

Trade dress qualifies for protection if it (i) is not functional and (ii) *either* is inherently distinctive *or* has acquired secondary meaning. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992). Duke's trade dress qualifies for protection under this standard. "A

product feature or package design is functional if it is essential to the product's use or if it affects the cost or quality of the article." *Vision Sports*, 888 F.2d at 614. The elements comprising Duke's trade dress -- the distinctive look of its characters and other artwork, and the overall presentation of its packaging -- have nothing to do with such functional concerns. Similarly, Duke's overall look is inherently distinctive. The design of each character and the other visual elements are arbitrary and fanciful -- and instantly recognizable to computer game consumers as signifying the Duke product. For the same reason, given Duke's incredible popularity, it is likely that the "look" of the product has developed secondary meaning in the market of computer game aficionados.

A trade dress claim also focuses on the likelihood of consumer confusion. *Id.* at 616. In the Ninth Circuit, likelihood of confusion is determined by evaluating eight factors:

> 1) strength of the allegedly infringed mark; 2) proximity or relatedness of the goods; 3) similarity of the sight, sound, and meaning of the marks; 4) evidence of actual confusion; 5) degree to which the marketing channels converge; 6) type of goods and degree of care consumers are likely to exercise in purchasing them; 7) intent of the defendants in selecting the allegedly infringing mark; and 8) likelihood that the parties will expand their product lines.

*Metro Publishing, Ltd. v. San Jose Mercury News*, 987 F.2d 637, 640 (9th Cir. 1993).

Even the briefest review of these factors shows the likelihood of confusion here. The similarities between DN3D's strongly recognizable trade dress and that of Nuke It are overwhelming. The overall look of the Nuke It product is derived from DN3D's protected artwork, simply rearranged in the new, amateur levels that Micro Star has appropriated. Micro Star has even gone so far as to include "screen saver" files in its product, effectively allowing computer owners to incorporate "freeze-frames" embodying DN3D's trade dress into their machines. Many of these images are included on the inner flap of Nuke It's package -- giving buyers substantial exposure to DN3D's trade dress at the point of purchase. The rest of Micro Star's packaging heightens the confusion. Nuke It's logo is set in a style and color of type extremely similar to DN3D's logo. Both boxes employ mushroom cloud imagery.

PKNS\0098634.WP

16

The Nuke It packaging also refers repeatedly to Duke Nukem 3D -- conveying the strong impression that the products are related.

Other factors strongly support a finding of likely consumer confusion: The products offered here are not only similar, they are directly linked; Movants and Micro Star are both selling Movants' protected properties to the same customers and market their products through the same channels; and it is clear from the total circumstances that Micro Star's emulation of DN3D's trade dress was intentional.

### 3. Nuke It's Packaging Also Violates the Lanham Act's Prohibition of False Advertising

Nuke It also violates the other branch of the Lanham Act -- prohibiting false statements about a product in interstate commerce. The elements of a Lanham Act false advertising claim are: (i) a false statement about a product, (ii) a tendency to deceive a substantial portion of the intended audience, (iii) that the deception is material, (iv) that the advertised goods travelled in interstate commerce, and (v) likely injury to the plaintiff. *See Cook, Perkiss and Liehe, Inc. v. Northern California Collection Serv., Inc.*, 911 F.2d 242, 243 (9th Cir. 1989).

The Nuke It package proclaims in bold letters that it contains "OVER 300 NEW LEVELS FOR DUKE NUKEM 3D." This statement is false. The levels contained in Nuke It are not "new" levels. Every one of them was previously available for free noncommercial use on the Internet. Moreover, each of the "new" levels is merely a "cut and paste" rearrangement of old levels with no additional artwork added. In some cases, the levels are virtually identical to original DN3D levels, with minor alterations.

These false statements are obviously material to discriminating video game buyers, are likely to deceive that audience into believing the product is something that it is not, and are likely to injure Movants by robbing them of sales for their own truly "new" level pack. There is no dispute that Nuke It is sold in interstate commerce. Thus, Movants have shown a likelihood of success on their false advertising claim, further entitling them to a preliminary injunction.

## III.    THE OTHER RELEVANT FACTORS FAVOR THE GRANTING OF A PRELIMINARY INJUNCTION

As noted above, upon a showing of likelihood of success on the merits of the copyright or trademark claim, irreparable harm is presumed and a preliminary injunction should be granted. In any event, both irreparable harm and the alternate preliminary injunction factors are overwhelmingly satisfied on the present record.

Micro Star has made clear that it intends to keep selling Nuke It unless it is enjoined from doing so. The harm flowing from Micro Star's continued infringement of Movants' copyright and Lanham Act rights is obvious and severe. Micro Star has appropriated material to which Movants have the exclusive rights of commercial exploitation and is trading on Movants' goodwill to make a profit on a product to which Micro Star contributed nothing but a confusingly similar box. As described above and explained more fully in the accompanying declarations, Movants have in the works their own set of new levels for the DN3D game. Each sale of Nuke It will erode the demand for that product, although it may be difficult to quantify the precise amount of lost sales.

Moreover, the harm to Movants' goodwill flowing from dissemination of the amateur levels contained in Nuke It will be hard to remedy and impossible to quantify. The harm will extend not just to lost sales on Movants' own level pack product, but will injure the reputation and commercial viability of the DN3D franchise as a whole. Such injury through a loss of quality control has been widely recognized as irreparable harm. *See, e.g., King v. Innovation Books*, 976 F.2d 824, 832 (2d Cir. 1992); *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 147 (4th Cir. 1987); *Sega Enters., Ltd. v. Maphia*, 857 F. Supp. 679, 683-84 (N.D. Cal. 1994). "[I]f an infringer's product is of poor quality, or simply not worth the price, a more lasting but not readily measurable injury may be inflicted on the plaintiff's reputation in the market." *Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971).

Based on the clear copyright infringement and Lanham Act violations, these harms are more than adequate to justify a preliminary injunction. The balance of harms also tips

PKNS\0098634.WP

18

dramatically in favor of Movants. A preliminary injunction will deprive Micro Star only of income from its infringing product, while continued sale of Nuke It may irretrievably injure Movants' reputation and the value of their DN3D franchise.

Finally, the public interest will clearly be served by granting a preliminary injunction. The rationale for protecting copyrighted works is to encourage creativity, from which the public benefits:

> Since Congress has elected to grant certain exclusive rights to the owner of a copyright in a protected work, it is virtually axiomatic that the public interest can only be served by upholding copyright protection and, correspondingly, preventing the misappropriation of the skills, creative energies, and resources which are invested in the protected work.

*Apple Computer Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1254-55 (3d Cir. 1983) (citation omitted). Moreover, if Micro Star were to prevail here, copyright owners would no longer be willing to offer features such as the Build Editor, lest they risk forfeiting their copyright -- thereby denying purchasers a desirable game feature.

Further, a central purpose of the Lanham Act is to protect the consuming public from the confusing and misleading use of trade dress and trademarks and other commercial deception in interstate commerce. *Playboy Enters., Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1275 (9th Cir. 1982). The public interest thus favors the granting of a preliminary injunction here to protect not just Movants' property rights but the right of consumers to be free from deception.

PKNS\0098634.WP

19

## Conclusion

For the reasons stated above, Movants respectfully request that the Court enter an order enjoining Micro Star from further distribution and sale of Nuke It and requiring all copies to be recalled and impounded pending trial.

Respectfully submitted,

DATED:  August 9, 1996

**POST KIRBY NOONAN & SWEAT  LLP
KRAMER, LEVIN, NAFTALIS & FRANKEL**

By: _____

Michael L. Kirby
Steven B. Duke
Attorneys for Defendants/Counterclaim-
Plaintiffs **FORMGEN, INC., GT
INTERACTIVE SOFTWARE CORP.** and
**APOGEE SOFTWARE, LTD.**

PKNS\0098634.WP

20